UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 9:19-CV-80017


ANV MANAGEMENT LLC

MACAW HOLDINGS IV, LLC

H. ALAN. WELLES

Plaintiffs

CITY OF RIVIERA BEACH, FLORIDA

    and

BOVELL RICHARDS

JOHN DOE 1

JOHN DOES 2-4

    Defendants

_____/

## **COMPLAINT WITH JURY DEMAND ENDORSED HEREON**

NOW COMES Plaintiffs ANV MANAGEMENT LLC, MACAW HOLDINGS IV, LLC and H. ALAN WELLES, by and through the undersigned counsel, and hereby sue and file this COMPLAINT against Defendants CITY OF RIVIERA BEACH, FLORIDA, BOVELL RICHARDS, JOHN DOE 1 AND JOHN DOES 2-4, and allege and aver as follows:

## **NATURE OF CASE**

1.    This is action for money damages and injunctive relief is brought pursuant 42 U.S.C. §1983, the Fourth and Fourteenth Amendments to the United States Constitution,

and under the laws of the State of Florida, against the City of Riviera Beach and current and/or former city officials and police officers.

2.     Plaintiff Alan Welles is a local real estate investor and businessman, who has suffered various unlawful threats, intimidation, and retaliation by the City of Riviera Beach and its city officials and police officers. This began when Alan Welles met with the assistant to the Riviera Beach Police Chief, the Police internal affairs department and the City Manager, and requested that they bring charges against a Riviera Beach policeman who brandished a gun while displaying his badge at Alan Welles' liquor store, and then, with two other accomplices, shot out the liquor store's outdoor lights and walked away with merchandise without paying.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331 and 42 USCS § 1983, as well as principles of supplemental jurisdiction under 28 U.S.C. § 1367.

4.     This Court is an appropriate venue for this action, pursuant to 28 U.S.C. §1391, because the material events or omissions upon which the claims are based occurred in this District, including Plaintiff's ownership of real property within this District that is the subject of this lawsuit, and Defendants' deprivation of Plaintiff's procedural due process rights guaranteed by the Fourth and Fourteenth Amendment to the United States Constitution, which occurred within this District relating to said real property.

5.     This Court has personal jurisdiction over Riviera Beach because it has a presence in the State of Florida as a Florida Municipality, and over Richards, John Doe 1 and John Doe 2-4 because they employed by Riviera Beach and engaged in continuous and systematic conduct in the State of Florida by acting as a building official.

## THE PARTIES

6.     Plaintiff ANV Management LLC ("ANV") is a limited liability company, organized under the laws of Florida, with a principal place of business at 315 President Barack Obama Highway, Riviera Beach, Florida 33404.

7.     MACAW HOLDINGS IV, LLC ("Macaw") is a limited liability company, organized under the laws of Florida, with a principal place of business at 4246 Okeechobee Blvd, Ste 101, West Palm Beach, Florida 33409.

8.     H. ALAN WELLES ("Welles") is an individual, over the age of eighteen, and is *sui juris*.

9.     CITY OF RIVIERA BEACH (hereinafter, "Riviera Beach") is a Florida municipality, located in Palm Beach County, Florida.

10.     BOVELL RICHARDS ("Richards") is a building official employed by Riviera Beach, within its Building and Inspection Department, and holds the title of Assistant Building Official.

11.     JOHN DOE 1 ("John Doe 1") is a Riveria Beach police officer who committed the wrongs alleged below, whose name is unknown.

12.     JOHN DOES 2-4 ("John Does 2-4") are unknown Riveria Beach police officers who threatened Welles, after he attempted to bring charges against the aforesaid police officer who engaged the unlawful conduct at Welles' liquor store.

## GENERAL BACKGROUND

A.     **Plaintiffs' Property/Business Interest**

13.     Welles is the sole owner/member of Macaw.

14.     Welles is the fifty percent owner/member and manager of ANV.

15.     Macaw owns and operates a liquor store and bar business ("Liquor Store") located at 4246 Okeechobee Blvd, Ste 101, West Palm Beach, Florida 33409.

16.     ANV owns commercial real estate located at 315 President Barack Obama Highway, Riviera Beach, Florida 33404 ( "Rental Property"), which it purchased on May 31, 2017.

17.     The Rental Property has a building located thereon, built approximately 50 years ago, which has commercial shopping space on the first floor and residential apartments on the second floor (hereinafter, the "Building").

**B.     Riviera Beach's Long Term And Pervasive Custom And Practice Of Violating The Constitutional Rights of Others**

18.     In *Lozman v. City of Riviera Beach*, 568 U.S. 115 (U.S. 2013), Riveria Beach lost a case in the United States Supreme Court to Fane Lozman, wherein Riveria Beach was  alleged to have entered into a  "back room" deal they made with private developer to  redevelop a marina where Lozamn moored a floating home, and then engaged in a persistent concerted campaign through its city administration and police department to silence and discredit Lozman through various unlawful act of false arrest, threats, retaliation and intimidation.

19.     Not having changed its ways, in *Lozman v. City of Riviera Beach*, 568 S. Ct. 1945 (U.S. 2018), Riveria Beach lost yet another in the United States Supreme Court to Fane Lozman, wherein Riveria Beach was  alleged to have arrested him for exercising his first amendment right to speak at a city council meeting, as part of its continued concerted activity of its city officials to threaten, intimidate and retaliate against him for exercising his constitutional rights.

20.     On January 10, 2017, Riviera Beach hired Ladi A. Goldwire a/k/a Ladi A, March ("Goldwire") as a building inspector in its building department. However, she lacked a required license at the time of hire, which was known by Riveria Beach.

21.     From January 10, 2017 through May 7, 2017, Goldwire took action as a Building Official, without being a licensed Building Official or a provisional Building Official,  which was a violation of Florida law and also known by Riveria Beach.

22.     During this time period between January 10, 2017 through May 7, 2017, Goldwire was accused of many questionable practices by numerous individuals and companies, which were known by Riveria Beach.

23.     In 2017, Riviera Beach and Goldwire were sued by Port of Palm Beach Cold Storage, Inc., in the Circuit Court of the 15th Judicial Circuit In and for Palm Beach County, Florida, assigned case no. 2017-CA-012388, relating to questionable practices of Goldwire and Riviera Beach.

24.     In 2018, Goldwire was criminally charged by the Office of the State Attorney, with falsely holding out herself as a certificate holder, which is pending in the County Court of the 15th Judicial Circuit, in and for Palm Beach County, Florida, assigned Case No. 502018MM004959XXXNB.

**C.     Riviera Beach's Violation Of Plaintiffs' Constitutional  Rights Through Its Police Department As Part Of This Long Term And Pervasive Custom And Practice of Violating Constitutional Rights**

25.     In October 2015, Welles' Liquor Store was held-up at gunpoint when two of three individuals brandished guns at a walk-up window at the carry-out. After demanding and receiving a Redbull drink without paying, they proceeded to shoot out the exterior lights on the property and threatened to shoot employee and customers. One of

three individuals was John Doe 1, a Riviera Beach police officer, who asserted his official authority and showed the store clerk his Riviera Beach police badge, while he brandished a gun and threatened the store clerk to shoot him and customers.

26.     Thereafter, Welles spoke with the assistant to the Riveria Beach Police Chief, internal affairs department, and the City Manager, and requested that charges be pressed against the Riviera Beach police officer and his accomplices.

27.     Shortly thereafter, John Does 2-4, are believed to be two off-duty or plain clothes on-duty Riviera Beach police officers, came to the bar owned by Welles's company, Macaw, located at 4246 Okeechobee Blvd, Ste 101, West Palm Beach, Florida 33409, and threatened him with retaliation if he pressed charges against the officer. In the end, the Riviera Beach police officer was not arrested or charged, despite the fact that one of his accomplices, an alleged gun dealer, was arrested. Around the same time, John Does 2-4, who are believed to be two Riviera Beach police officers, came the Liquor Store and threatened the store clerk with arrest and removing his children from his household, for the specific intent and purpose to intimidate him into not pressing charges. The Employee walked off the job and quit out of fear of retaliation of said police officers and Riviera Beach.

28.     Thereafter, the Riviera Beach police officers routinely began a practice of coming onto the Rental Property for no justifiable reason and without being invited, and harassing the patrons of a grocery mart that operates on the Property.

29.     The Riviera Police Department has a practice and policy of not harassing similar business property owners if they pay Riviera Beach for police protection.

30.      Plaintiffs refuse to pay for police protection.

**D.**   **Riviera Beach's Violation Of Plaintiffs' Constitutional Rights Relating to the Rental Property Through Its Building Department As Part Of Its Long Term And Pervasive Custom And Practice**

31.     On August 25, 2017, ANV, as lessor, entered into a written commercial lease with Tangela Hill, as lessee (hereinafter, the "Lease"), whereby Plaintiff agreed to lease Suites 104 and 105 within the Building, which she intended to use to operate a retail beauty supplies and hair salon business (hereinafter, the "Salon Business"). The use applied for by the tenant was a permitted use and leasehold space had just previously been occupied by a salon/barbershop.

32.     The term Lease was five years and three months.

33.     The Lease required Tangela Hill to pay to Plaintiff as follows:

(i) Year One-$2500 month for rent plus $150.00 for water, sewer trash and Sales Tax; and

(ii) A five percent (5%) increase in rent every year beginning September 1, 2018.

34.     A true, accurate and authenticate copy of the Lease is attached hereto as Exhibit A.

35.     Tangela Hill took occupancy of the leasehold premises on or about August 25, 2017.

36.     On September 18, 2017, Tangela Hill submitted an application to Riviera Beach for a "Certificate of Use/Business Tax Receipt" for her Salon Business.

37.      Pursuant to Article VII, Sec. 10-243, and Article V, Sec. 10-132, of the Code of Ordinance of the City of Riviera Beach, a Certificate of Use and Business Tax Receipt (hereinafter, the "COU/BTA") needed to be issued by Riviera Beach as a condition of Tangela Hill opening her Salon Business.

38.     A true, accurate and authenticate copy of the application for the COU/BTA is attached hereto as Exhibit B.

39.     In November 2017, over two months after submission of the application for the COU/BTA, Richards advised Welles that the application would not be processed by Riviera Beach, unless and until Welles identified all work that had ever been done to the Property without a permit, including work relating to electrical, plumbing, and mechanical. In other words, Richards did not deny the application for the COU/BTA, he refused to process it or act upon it.

40.     Welles responded to Richards by explaining that he had just purchased the Property a few months earlier (on May 31, 2017) and had not performed any work requiring any permit, and that he had no idea whether unpermitted work had been performed on the Building in the past 50 plus years by the  numerous prior owners, and that he needed Richards to specifically identify what he believed was unpermitted work or otherwise not code compliant.

41.     The codified procedure of Riviera Beach, and throughout the United States, is for governmental officials to issue written warnings and/or citations that specify exactly why a building or property is not code compliant. The burden is never placed on the property owner to try to figure out whether their property is code compliant. These requirements are predicated on basic procedural due process rights.

42.     Chapter 10, Article VII, Sec. 10-245, of the Riviera Beach Ordinances states the specific grounds that a COU can be denied and requires written notification of the grounds for the denial and the right to a hearing before a special master:

> *"Enforcement procedures.* Upon determination by the city that an owner/ap-
> plicant is in violation of the provisions of this article, the city shall notify, in

writing, the owner/applicant of the premises of the nature of the violation and provide notice of a hearing before the special magistrate pursuant to section 2-335, enforcement procedures. The conduct for such hearing shall be in conformance with section 2-336, conduct of hearing. The special magistrate's findings and order shall constitute the final administrative action of the city for purposes of judicial review under state law.

(1)   *Issuance or denial by the city.* The city must either issue or deny issuance of a certificate of use within 40 days after application is made for such certificate or for the renewal of the current certificate. An owner/applicant may also request a hearing as set forth herein before the special magistrate regarding the denial of the issuance of a certificate of use for that business by the city. The request for hearing must be in writing and filed with the city within ten days of the receipt of the written decision by the city." (Ord. No. 3078, § 1 (5), 4-7-10).

43.     Chapter 2, Article VI, Division 1, Sec. 2-311, of the Riviera Beach Ordinances states that a code enforcement officer must provide written notice of any code violations prior to issuing a citation, and then issue a citation if the code violation(s) is not cured no later than 30 days:

"Prior to issuing a citation, a code enforcement officer shall provide notice to the person that the person has committed a violation of a code or ordinance and shall establish a reasonable time period within which the person must correct the violation. Such time period shall be no more than 30 days. If, upon personal investigation, a code enforcement officer finds that the person has not corrected the violation within the specified time period, a citation may be issued to the person who has committed the violation. However, a reasonable time period to correct a violation prior to issuing a citation is not required if the code enforcement officer has reason to believe that the violation presents a serious threat to the public health, safety, or welfare, or if the violation is irreparable or irreversible." (Code 1957, § 2-35).

44.     Chapter 2, Article VI, Division 1, Sec. 2-312, of the Riviera Beach Ordinances states that the following specific information must be provided with a citation:

"Pursuant to F.S. § 162.21(c), a citation issued by a code enforcement officer shall contain:

(1)    The date and time of issuance.

(2)    The name and address of the person to whom the citation is issued.

(3)    The date and time the civil infraction was committed.

(4)     The facts constituting reasonable cause.

(5)     The number or section of the code or ordinance violated.

(6)     The name and authority of the code enforcement officer.

(7)     The procedure for the person to follow in order to pay the civil penalty or to contest the citation.

(8)     The applicable civil penalty if the person elects to contest the citation.

(9)     The applicable civil penalty if the person elects not to contest the citation.

(10)     A conspicuous statement that if the person fails to pay the civil penalty within the time allowed, or fails to appear in court to contest the citation, he shall be deemed to have waived his right to contest the citation and that, in such case, judgment may be entered against the person for an amount up to the maximum civil penalty. (Code 1957, § 2-35.1)"

45.     Chapter 22, Article II, Division 1, Sec. 22-35, of the Riviera Beach Ordinances also requires a building official provide written notice of violation regarding any unsafe building, containing the specific information describing the unsafe condition:

"Whenever the building official has determined that such structure, property or portion thereof is unsafe, the building official shall prepare a written notice of violation and notice of pending administrative action to the owner of record as identified by a search of the public records in and for the Palm Beach County. Should the building official and the city engineer or their designees jointly determine that the structure, property or portion thereof presents an immediate and genuine threat to the safety of individuals or the public at large, the city may take any action necessary to abate such threat, including, but not limited to, the demolition of the structure without providing the procedural safeguards set forth below.

(1)     The notice of violation shall contain, but not be limited to, the following information:

a.     The street address and legal description or property control number of the building, structure, or property.

b.     A statement indicating the building or structure has been declared unsafe by the building official, and a summary of the conditions that led to the building official's determination." (Ord. No. 2971, § 5, 6-16-04).

46.     Welles then provided Richards with a copy of a report from a qualified professional engineer, which stated that the building was safe to occupy, hoping that he would issue the COU.

47.     Welles then complained at a meeting of the City Commissioners regarding the refusal to process the application, but they did nothing to rectify same.

48.     Goldwire, the unlicensed building inspector, was assisting Richards in refusing to issue the COU and refusing to issue any written citation or warning advising Welles what was allegedly noncompliant with his Rental Property.

49.     Riveria Beach, Richards and Goldwire knew that Plaintiff had entered into the Lease with Tangela Hill, that she had taken occupancy of the leasehold premises, that she could not open her Salon Business without issuance of the COU/BTA, and that she would probably move out and not honor her Lease if that she could not open her Salon Business.

50.     Neither Richards nor anyone else on behalf of Riviera Beach issued any warnings, citations or notices of violations and remained steadfast in refusing process to issue the COU.

51.     Notably, the same space had been occupied for years by another barbershop business.

52.     Because Richards and Riviera Beach refused to process and issue the application for the COU/BTA, Tangela Hill vacated the premises and abandoned the Lease and vacated the leasehold premises in 2018, resulting in damages to ANV.

53.     On October 23, 2018, following ANV's aforesaid loss of its tenant, Richards caused a stop work order to be issued against Plaintiff, relating to "mini-splits"

air-conditioners having been changed out in the residential units on the second floor of the Building. Said citation threatened to shut electrical power to the entire building, not just the residential unit, if permits were not pulled by Plaintiff within 72 hours/

54.     The threat to shut off to the entire Building, as opposed to just the effected residential unit, was completely improper and unlawful.

55.     The allowance of only 72 hours to pull the required permits was arbitrary and unreasonable.

56.     Thereafter, Riviera Beach contacted Plaintiff's residential tenants and advised them to stop paying rent to Plaintiff, which was improper and unlawful.

57.     Plaintiff pulled all required permits and fully complied with the stop work order, although no work had been done for nearly one year prior to the stop work order.

58.     During this same time, officials of Riviera Beach refused for no justifiable reason to issue sign permits for legal tenants in Building that had occupied their leasehold space for more than 30 years.

59.     Because of the refusal of  Riveria Beach, the City Manager, Richards and Goldwire to follow their procedural due process requirements and give written notice to Welles and ANV regarding what was allegedly non-compliant with the Rental Property, they had no available procedural remedy for review and/or appeal by Riviera Beach.

60.     Because of the refusal of Riveria Beach, the City Manager, Richards and Goldwire to follow their procedural due process requirements and give written notice to Welles and ANV regarding what was allegedly non-compliant with the Rental Property, they could not pursue a "first tier" certiorari review the Circuit Court, since there was no record or written citation or warning.

61.     Because the pervasive pattern of noncompliance and threats to continue to refuse to act in the future by Riveria Beach and Richards, Welles and ANV could not pursue a mandamus action in Circuit Court, since mandamus does not lie to prevent future harm or where continued judicial supervision is required as in the instant case.

62.     The police misconduct and Riviera Beach's failure to arrest and charge the police officer, the threats against Welles by other police officers not to press charges, the harassment of patrons on the Rental Property, the outright denial of procedural due process rights in refusing to issue the COU, and the tortious  interference by telling tenants them not to pay rent, is part of a  long term and pervasive custom and practice of Riviera Beach and its officials.

63.     As in the case of Fane Lozman, Welles has come to learn that Riveria Beach officials, including commissioners, have intent on driving him out of Riveria Beach.

### FIRST CAUSE OF ACTION
**(Violation of Fourth Amendment)**
**(Welles and Macaw against John Doe 1, John Does 2-4 and Riviera Beach)**

64.     Plaintiff re-alleges and re-avers paragraphs 1 through 63 above as though fully re-written herein.

65.     The Fourth Amendment is made applicable to the States by the Fourteenth Amendment to the United States Constitution.

66.     Welles and his company, Macaw, have the right under the Fourth Amendment to the United States Constitution not be subjected to unjustified force or excessive force by police officers and not to be subjected to meaningful interference with their possessory interests in business, occupation and/or property, because it violates the prohibition against unreasonable seizures.

67.     John Doe 1's aforesaid conduct was unjustified and not "objectively reasonable" in light of the facts and circumstances.

68.     John Doe 1's aforesaid conduct was unjustified force and excessive force, which subjected Welles and Macaw to a meaningful interference with their possessory interests in their Liquor Store business and occupation and property, and deprived them of their Fourth Amendment right to not be subjected to unreasonable seizures.

69.     John Does 2-4 aforesaid conduct was likewise unjustified force and excessive force, which subjected Welles and Macaw to a meaningful interference with their possessory interests in their Liquor Store business and occupation and property, and deprived them of their Fourth Amendment right to not be subjected to unreasonable seizures.

70.     John Doe 1 was acting under color of state law when he acted as aforesaid and brandished his police badge and gun.

71.     John Does 2-4 were acting under color of state law when they threatened Welles not to press charges against John Doe 1.

72.     Riviera Beach was the moving force behind John Doe 1's and John Does' 2-4 deprivation of the constitutional rights of Welles and Macaw, because the conduct of John Doe 1 and John Does 2-4 was the direct and proximate result of an aforesaid pervasive, custom, policy, and practice of allowing police officers and governmental officials to violate the constitutional rights of Plaintiffs and others.

73.     Further,  Riviera Beach acted with deliberate indifference to the constitutional rights of Welles and Macaw, by failing to take appropriate action against John Doe 1,  and Riviera Beach had "actual or constructive notice" that its actions or failure to act

was substantially certain to result in said constitutional violations, and it consciously and deliberately chose to disregard the risk of harm.

74.     As a direct and primate result of said deprivation constitutional rights, Welles and Macaw sustained general and special damages.

75.     The aforesaid deprivation of the constitutional rights of Welles and Macaw by John Doe 1, John Does 2-4 and Riviera Beach was willful, wanton and/or in reckless disregard for the rights of Welles and Macaw.

WHEREFORE, Welles and Macaw demand judgment against John Doe 1, John Does 2-4 and Riviera Beach, jointly and severally, pursuant to 42 U.S.C. §1983, for general and special damages, pre-judgment and post judgment interest, punitive damages, attorney's fees costs, and any other relief this Court deems just and proper.

**SECOND CAUSE OF ACTION**
**(Violation of Fourteenth Amendment-Procedural Due Process)**
**(Welles and ANV against Richards and Riviera Beach)**

76.     Plaintiff re-alleges and re-avers paragraphs 1 through 63 above as though fully re-written herein.

77.     The Fourteenth Amendment is made applicable to the States by the Fourteenth Amendment to the United States Constitution.

78.     The procedural due process of the Fourteenth Amendment protects land use and property rights, as state-created property rights.

79.     The procedural due process of the Fourteenth Amendment protects the rights of Welles and ANV to have notice as to why the Rental Property was allegedly noncompliant and then an opportunity to be heard before a fair and impartial administrative tribunal, which is actual codified in the aforesaid ordinances of Riviera Beach.

80.     Welles and ANV were deprived of their procedural due process rights by the City Manager's, Richards'  and Goldwire's refusal to issue the COU and follow their procedural due process requirements and give written notice to Welles and ANV regarding what was allegedly non-compliant with the Rental Property.

81.     Their actions were also arbitrary and capricious and of such a substantial departure from accepted norms as to demonstrate that these decisionmakers "did not actually exercise professional judgment.

82.     The state did not afford Welles and ANV adequate procedural rights prior to depriving them of their protected interest: a) because they had no available procedural remedy within the Riviera Beach review and appeal process given the lack of a required written notice via a citation or warning to Welles and ANV regarding what was allegedly non-compliant with the Rental Property; b) they could not pursue a "first tier" certiorari review the Circuit Court, since there was no record or written citation or warning; and they could not pursue a mandamus action in Circuit Court, since mandamus does not lie to prevent future harm or where continued judicial supervision is required as in the instant case.

83.     Richards and Goldwire were acting under color of state law when they acted as aforesaid.

84.     The City Manager was acting under color of state law when he failed to take nay corrective action.

85.     Riviera Beach was the moving force behind this deprivation of the constitutional rights of Welles and ANV, because the conduct of Richards and Goldwire was the direct and proximate result of an aforesaid pervasive, custom, policy, and practice of allowing police officers and governmental officials to violate the constitutional rights of

Plaintiffs and others, and because the City Manager was the ultimate policy making official on the matter.

86.     As a direct and primate result of said deprivation constitutional rights, Welles and ANV sustained general and special damages, including the loss of renal income.

87.     Further, Welles and ANV shall continue to suffer deprivation of the constitutional rights and the damages if Riveria Beach and Richards are not enjoined from continuing its pattern of noncompliance with its own ordinances and enjoined from continuing to violate their constitutional rights.

88.     The aforesaid deprivation of the constitutional rights of Welles and ANV by John Doe 1, John Does 2-4 and Riviera Beach was willful, wanton and/or in reckless disregard for the rights of Welles and Macaw.

WHEREFORE, Welles and ANV demand judgment against Richards and Riviera Beach, jointly and severally, pursuant to 42 U.S.C. §1983, for general and special damages, pre-judgment and post judgment interest, punitive damages, attorney's fees costs, injunctive relief, enjoining Riviera Beach and Welles  from continuing their pattern of noncompliance with Riviera Beach's ordinances and enjoining them from continuing to violate their constitutional rights, and any other relief this Court deems just and proper.

### THIRD CAUSE OF ACTION
**(Conspiracy to Violate of Fourteenth Amendment-Substantive Due Process)**
**(Welles, ANV and Macaw against John Doe 1, John Does 2-4 and Riviera Beach)**

89.     Plaintiff re-alleges and re-avers paragraphs 1 through 63 above as though fully re-written herein.

90.     The Fourteenth Amendment is made applicable to the States by the Fourteenth Amendment to the United States Constitution.

91.     Substantive due process of the Fourteenth Amendment protects against the unjustified infringement of a liberty interest in pursuing a common occupation or profession of life by a governmental body that shocks the conscience, including the right not to be subjected to arbitrary or irrational zoning decisions that shock the conscience.

92.     The  aforesaid conduct of John Doe 1 in holding up the Liquor store and then shooting out its lights with his two accomplices, the conduct of John Does 2-4 in threatening Welles and the store clerk, the conduct of Riviera Beach in not pursuing charges against John Doe 1, the conduct of Riviera Beach in hiring and allowing a person to act unlawfully as an unlicensed building inspector (Goldwire), the conduct of Richards and Goldwire in refusing to issue the COU and refusing to issue a written citation or warning, the conduct of Riviera Beach officials in telling ANV's tenant not to pay rent, the conduct of the City Manager in not doing anything to correct the misconduct of Richards and Goldwire, and the conduct of the Riviera police department in harassing ANV's patrons, combined with Riviera Beach's pervasive pattern of violating other person's constitutional rights, violated Welles', ANV's and Macaw's  substantive due process rights in that said conduct was an unjustified infringement of a liberty interest in pursuing a common occupation or profession of life and intereference with property rights by a governmental body that shocks the conscience.

93.     John Doe 1, John Does 2-4, Richards and Goldwire was acting under color of state law.

94.     Riviera Beach was the moving force behind said constitutional rights of Welles and Macaw, because the conduct of John Doe 1, John Does 2-4, of Richards, Goldwire and the City Manager was the direct and proximate result of an aforesaid pervasive, custom, policy, and practice of allowing police officers and governmental officials to violate the constitutional rights of Plaintiffs and others.

95.     Riviera Beach, Welles and Macaw, John Doe 1, John Does 2-4, of Richards, Goldwire and the City Manager entered into a conspiracy to drive Welles out of Riveria Beach and inflict retribution against him, by violating the constitutional rights of Welles, and companies he owned, AMV and Macaw, which they carried out in a concerted manner by acting as foresaid.

96.     As a direct and primate result of said deprivation constitutional rights, Welles, ANV and Macaw sustained general and special damages.

97.     The aforesaid deprivation of the constitutional rights of Welles, ANV and Macaw by John Doe 1, John Does 2-4 and Riviera Beach was willful, wanton and/or in reckless disregard for the rights of Welles and Macaw.

WHEREFORE, Welles, ANV and Macaw demand judgment against John Doe 1, John Does 2-4 and Riviera Beach, jointly and severally, pursuant to 42 U.S.C. §1983, for general and special damages, pre-judgment and post judgment interest, punitive damages, attorney's fees costs, and any other relief this Court deems just and proper.

### FOURTH CAUSE OF ACTION
**(Declaratory Judgment-State Law Claim)**
**(ANV against Riviera Beach)**

98.     Plaintiff re-alleges and re-avers paragraphs 1 through 63 above as though fully re-written herein.

99.     ANV brings this claim for declaratory judgment, pursuant to Fla Stat. §86.011 et. seq.

100.    ANV contends Riviera Beach violated its ordinances because it could not deny issuance of the COU predicated on alleged non-compliance of the Building, without advising ANV what was allegedly non-complaint by issuing a written warning and/or citation. Riviera Beach denies that it has any such obligation and contends that its building inspectors can simply place the burden on property to owners to advise the city what is non-complain with their building.

101.    A determination as to the rights and obligations of ANV and Riviera Beach will be of material help in resolving this controversy and is required of the Court.

102.    All of the proper parties are before the Court for a determination.

103.    The parties have an actual, present, adverse and antagonistic view of their rights and obligations in this regard.

104.     There is a bona fide, actual, present practical need for a declaration, and the declaration deals with a present, ascertained state of facts or a present controversy as to a state of facts.

105.    The rights, obligations and privileges of the parties are dependent upon the facts or the law applicable to the facts.

106.    All adverse interests are before the Court.

107.    The relief sought herein is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity.

108.    There is a real and present need for a Court determination of the rights and obligations of the parties in this regard.

109.    As a direct and proximate result of the aforesaid refusal to issue the COU under the circumstances, ANV lost its tenant and sustained damages.

WHEREFORE, ANV respectfully requests that this Court enter judgment, declaring: that Riviera Beach cannot place the burden on property owners to advise the city and its officials as to how their property is non-complaint and use the property owner's failure to do so as a predicate to deny a COU or other property rights; that Riviera Beach and its officials violated their own ordinances  by refusing to issue the COU under the circumstances; for an award of money damages, attorney's fees and for all other relief deemed appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable as a matter of right.

Respectfully submitted,

By: */s/ Gregory R. Elder*
         Gregory R. Elder

Law Offices of Gregory R. Elder, LLC
Gregory R. Elder, Esq.
FBN: 0054006
201 North Ocean Drive
Hollywood, FL  33019
Tel: (305) 546-1061
gelderlaw@gmail.com
Attorneys for Plaintiff

EXHIBIT A

# COMMERCIAL LEASE

This Lease (the "Lease"), entered into on this ___25__ th day of __August__ , 2017 between ANV Management, a Florida limited liability company, having its principal place of business c/o H. Alan Welles Real Estate, LLC, 5659 Whirlaway Rd.., Palm Beach Gardens, Florida, 33418, referred to as "Lessor," and _Tangela Shieree Hill_____ having his principal place of business at 315 President Barack Obama Blvd.,Suite 104 & 105, Riviera Beach, Palm Beach County, Florida, _33404_ referred to as "Lessee." With a home address: [redacted] , FL _33404_ . DL# [redacted] ,

phone: ___Alex Gomez 561-657-2836_____ , email ___jdsbeautysupplies@gmail.com___ .

[redacted]

## SECTION ONE

## DESCRIPTION OF PREMISES

Lessor leases to Lessee the Premises located in the "315 President Barack Obama Blvd.", 315 President Barack Obama Blvd., Ste 104 & 105., Riviera Beach, Palm Beach County, Florida, (the "Shopping Center"), and described more particularly as follows: _315 President Barack Obama Blvd._

It is further understood and agreed that the Tenant is fully responsible for maintaining and allowing the use of an ADA handicapped restroom facility along with clear passage to and from said restroom during normal business hours of no later than 10:00 AM until no earlier than 6:00 PM Monday through Sunday for the entire shopping center located at 315 President Barack Obama Blvd., Riviera Beach, FL.

## SECTION TWO

## TERM

The term of this Lease is Five (5) Years Three Months _ Sixty-One_ (_61_) months. The Commencement Date "September 1, 2017" and terminating Sixty-One (61) months after occupancy date. The Termination Date "September 30, 2022".

## SECTION THREE
## FIXED RENT AND OTHER CHARGES

A.  FIXED RENT. Lessee shall pay Lessor Fixed Rent in the following amounts:

B. Inclusive of IOE, Plus water and sewer charges Plus Sales Tax (if applicable)

(1) Year 1 – $2,500 Gross per month, plus (water, sewer, trash $150 per month) and Sales Tax.

Prepaid rent covers _(September 2017 free Fixed Rent) October__ 2017. Next rent payment shall be due on __November 1_, 2017.

(2) There shall be an annual increase of Five Percent 5% each year beginning September 1, 2018.

TH

INITIAL OPERATING EXPENSES "IOE": $_155.19_ per month (subject to adjustment pursuant to Section 8). Lessee's Proportionate Share of Operating Expenses shall be _Twenty-Four and 84/100_ percent (_22.44_%), which share is derived by dividing the number of square feet contained in the Premises (stipulated to be _700_ square feet) by the "Net Shopping Center Square Footage", which is the aggregate number of square feet contained in the Shopping Center being used for retail purposes (6239sf).

C. SECURITY DEPOSIT: $2,835.50 The Deposit shall be held as security for the payment of Rent, and for performance of all other terms, covenants and conditions of Lessee hereunder; the amount of the Deposit, without interest, shall be repaid to Lessee after the Termination Date, provided Lessee shall have performed all terms, covenants and conditions under this Lease. Upon any Event of Default by Lessee, all or part of the Deposit may, at Lessor's sole discretion, be applied on account of such default, and thereafter Lessee shall promptly restore the resulting deficiency in the Deposit. The Deposit may be co-mingled by Lessor with its own funds. Lessee acknowledges that the Deposit is not to be construed as prepaid Rent by Lessee for any rental period during the Term.

E. DUE ON SIGNING: Five Thousand Six Hundred Seventy One and 00/100 Dollars ($5,671.00). October 2017 Fixed Rent shall be due at Lease Execution. September 2017 Fixed rent shall be at no charge.

F. PAYMENT; LATE FEES: Fixed Rent, Operating Expenses and any other payments due under this Lease (whether or not designated as "Additional Rent" hereunder) shall be collectively referred to as "Rent". Lessee shall pay Lessor the Fixed Rent and Operating Expenses in monthly installments with succeeding payments as called for in the Lease due on the 1st day of each subsequent month during the Term of the Lease. Late Fees in the amount of the greater of Two Hundred Even Dollars ($200.00) or 1.5% per month (or if less, the maximum amount allowed under applicable law) shall be assessed if Rent (or any portion thereof) is not received by the 5th of the month in which it becomes due.

SECTION FOUR

CONDITION OF THE PREMISES

The Premises are being taken in strictly "AS-IS, WHERE IS" condition and Lessee accepts same in the condition existing on the date delivered without claims for repairs or improvements. Acceptance of the Premises by Lessee shall be construed as recognition that the Premises are in a good state of repair and in sanitary condition on the date delivered, which Premises are hereby accepted by the Lessee. Lessor makes no express or implied warranty or representation as to the fitness of the Premises for Lessee's intended use, nor the condition of any systems or services serving the Premises, including without limitation the HVAC or any utility service. Lessee shall arrange and pay for all utilities furnished to the Premises for the Term of this Lease, including, but not limited to, electricity, gas, water, sewer, and telephone service. Walls and floor may be delivered as concrete with no other finishes.

SECTION FIVE

USE OF PREMISES; RESTRICTIONS ON USE

Lessee may use the Premises for the purposes of a __Barber Shop / Salon and Beauty Supplies__. Lessee shall operate under the trade name "_JD's Beauty Supplies, Barber Shop and Salon_" and shall not change such trade name without the prior consent and approval of Lessor. Lessee shall restrict its use to

2

TH

such purpose, and shall not use or permit the use of the Premises for any other purpose without the prior, express, and written consent of Lessor or Lessor's authorized agent. Lessee shall not use the Premises in any manner that will increase risks covered by insurance on the Premises and/or result in an increase in the rate of insurance or a cancellation of any insurance policy, even if such use may be in furtherance of Lessee's business purposes.

Lessee shall not keep, use, or sell anything prohibited by any policy of fire insurance covering the Premises, and shall comply with all recommendations and requirements of the insurers applicable to the Premises and necessary to keep in force the casualty and liability insurance.

LESSEE MUST ALLOW USE OF THEIR RESTROOM FACILITY TO THEIR CUSTOMERS AS WELL AS CUSTOMERS OF ANY OTHER BUSINESS ON THE PREMISES.

## SECTION SIX

### WASTE, NUISANCE, AND COMPLIANCE WITH LAWS

Lessee shall not allow any waste or nuisance on the Premises, nor use or allow the Premises to be used for any unlawful purpose or in an unlawful manner. Lessee shall comply with all laws, rules, regulations or ordinances governing the Premises, shall obtain and keep in full force and effect all occupational, sales tax or other licenses required by any governmental agency having authority over Lessee's business, and shall pay all dues, fees, taxes or other charges imposed on Lessee's business by any authorized governmental authority.

## SECTION SEVEN

### DELAY IN DELIVERING POSSESSION

This Lease shall not be rendered void or voidable by the inability of Lessor to deliver possession to Lessee on the Commencement Date set forth in Section Two. Lessor shall not be liable to Lessee for any loss or damage suffered by reason of such a delay; provided, however, that Lessor does deliver possession no later than _May 1, 2016_. In the event of a delay in delivering possession, the rent for the period of such delay will be deducted from the total rent due under this Lease. No extension of this Lease shall result from a delay in delivering possession. Notice must be sent in writing and received no later than _May 1, 2016_ in order to void lease.

## SECTION EIGHT

### OPERATING EXPENSES

A. The term "Operating Expenses" shall mean all costs and expenses incurred by or on behalf of Lessor in operating, managing, maintaining and repairing the Shopping Center, including, without limitation, all costs with respect to insurance expenses, real estate taxes, all costs and expenses of operating, managing, maintaining, repairing and replacing, signing, cleaning, painting and striping of the Shopping Center (including, without limitation, the cost of uniforms, equipment and employment taxes); payroll burden of all employees (payroll taxes and employee benefits); alarm and life safety systems;

janitorial services; maintenance of sprinkler systems; removal of water, trash and debris; payments required by governmental authorities; costs and expenses in connection with maintaining governmental authority ambient air and environmental standards; the costs of all materials, supplies and services purchased or hired therefore; operation of public toilets; maintenance, repair and replacement of utility systems serving the Shopping Center including, without limitation, water, sewer and storm water lines and other utility lines, pipes and conduits; costs and expenses of inspecting and depreciation of machinery and equipment used in the operation and maintenance of the Shopping Center and personal property taxes and other charges (including, but not limited to, financing, leasing or rental costs) incurred in connection with such equipment; costs and expenses of capital repairs and replacements to the Shopping Center, including, without limitation, lighting and shrubbery; costs of providing water, sewer, power and other utilities to the Shopping Center; the cost of any capital improvements made to the Shopping Center by Lessor that reduce other Operating Expenses or made to the Shopping Center required under any governmental requirement; and administrative costs attributable to the Shopping Center for on-site personnel and an overhead cost equal to fifteen percent (15%) of the total costs and expenses of operating and maintaining the Shopping Center. Lessor may elect to amortize any of the foregoing costs and expenses over such period as Lessor shall determine together with interest at the rate of fifteen percent (15%) per annum.

B. Commencing on the Commencement Date, Lessee shall pay, with each monthly installment of Fixed Rent, one-twelfth (1/12) of Lessee's Proportionate Share of annual Operating Expenses. Such amounts shall be calculated by Lessor based upon the prior (calendar or fiscal, at Lessor's sole election) year actual amounts incurred by Lessor with respect to such Operating Expenses and Lessor shall include an amount reasonably estimated by Lessor toward any increase in such charges for such succeeding years. Lessor may at any time increase such estimate of the Operating Expenses in accordance with the provisions of this Section. Upon determination by Lessor of the actual amounts incurred by Lessor during the then current year for such charges, Lessee shall pay upon demand the amount of any deficiency in such estimated payments toward the actual amounts incurred therefor by Lessor, and Lessor shall credit any overpayment by Lessee toward the next accruing monthly payments for such charges until fully recouped. Lessee's obligation to pay the Additional Rent pursuant to this Section which accrues during the Term shall survive expiration or earlier termination of this Lease. After the end of each calendar year during the Term, Lessor shall furnish to Lessee a statement in reasonable detail of the actual costs and expenses related to the Operating Expenses payments, and there shall be an adjustment between Lessor and Lessee, with payment to or repayment by Lessor, as the case may require. Any required repayment by Lessor may be accomplished, at Lessor's option, by crediting the amount of overpayment against Fixed Rent or future monthly payments of Operating Expenses (or any portion thereof as determined by Lessor) which may be or become owed by Lessee, and shall be deemed conclusive between the parties. Such statement may also contain an estimate by Lessor of the Operating Expenses payments for the next succeeding year, and Lessor may adjust from time to time the estimated payments of Operating Expenses. Until such time as Lessor provides a statement adjusting the estimated Operating Expenses payments, Lessee shall continue to make payments in the amount of the prior estimated amount from Lessor, subject to adjustment pursuant to this Section, and upon notification of the increase by Lessor, Lessee shall pay the full amount of the increase which is due for any prior months during the adjusted period and thereafter continue to make payments at the adjusted amount.

4

TH

## SECTION NINE

## REPAIRS AND MAINTENANCE

A. Lessor shall maintain the roof, foundation and structural soundness of the exterior walls (excluding all windows and doors) of the buildings and the Common Areas located in the Shopping Center.

B. Lessee shall, at its sole cost and expense, maintain, repair and replace all other parts of the Premises in good condition and repair including, without limitation, all utilities, fixtures, mechanical, electrical, plumbing systems and equipment located in, on or about the Premises, and the heating, ventilating and air conditioning ("HVAC") system(s) servicing the Premises. Lessee, at its sole cost and expense, shall keep and maintain the Premises and the areas immediately surrounding the Premises, at all times in a neat, clean and sanitary condition (including the removal and/or disposal of any trash) and in accordance with all governmental requirements, and Lessee shall, at its sole cost and expense, repair and replace all damage to the Premises caused by Lessee and its agents, officers, employees, contractors and invitees. If Lessee fails to comply with the above obligations and such failure continues for three (3) days after notice from Lessor, Lessor may perform, but is not obligated to perform, any such Lessee obligation, and the cost thereof shall be paid by Lessee as Additional Rent within ten (10) days of demand from Lessor. It is the parties intention that the Lease be a "net lease", and Lessee shall pay, in addition to Rent, all costs and expenses related to the Premises, including without limitation, all maintenance, repair and replacement expenses, except as specifically provided to the contrary in this Lease. Lessee shall throughout the Term maintain a service contract with an air conditioning repair firm approved by Lessor, at Lessee's sole cost, for the regular and emergency maintenance and repair and replacement of the HVAC systems servicing the Premises, including, without limitation, the periodic cleaning of the coils of the HVAC unit. Neither Lessee nor Lessee's employees, agents contractors or invitees shall be permitted access to the roof of the Premises or Shopping Center. Additionally, if the HVAC system (or other utility equipment) is damaged by vandalism, fire, lightning or other casualty, Lessee shall be responsible for the cost of repair (and if necessary, replace) the equipment. Lessee's sole right of recovery shall be against Lessee's insurers for loss or damage to stock, furniture and fixtures, equipment, improvements and betterments. For any work that Lessee is responsible under this Lease which involves access to and/or penetration of the roof surface, Lessee shall provide Lessor prior written notice and shall employ Lessor's contractor at Lessee's sole cost. Notwithstanding anything to the contrary contained in this Lease, Lessee shall not be permitted to perform any structural alterations or repairs to the Premises, and at Lessor's sole election either Lessor or Lessor's designated contractor shall perform, at Lessee's sole cost and expense, any such structural alterations and repairs. As a part of Lessee's general maintenance obligation, Lessee shall enter into an annual contract with a licensed, bonded and insured pest control contractor reasonably acceptable to Lessor, fully licensed to inspect and treat for pests, which shall provide services as dictated by Lessee and as Lessor may reasonably require from time to time. Upon demand by Lessor, Lessee shall furnish to Lessor a copy of the pest control maintenance contract described above. Nothing stated hereinabove shall limit Lessee's obligation to maintain the Premises free of pests throughout the Term. Tenant shall be responsible for landscape maintenance and all utilities for the property.

COMPLIANCE WITH ORDINANCES / PERMITTED USE:

(a)     Compliance: The Tenant shall promptly execute and comply with all statutes, ordinances, rules, orders, regulations and requirements of the Federal, State, County, and City Government, and of any and all their departments and Bureaus applicable to said premises, for the correction, prevention, and

abatement of nuisances or other grievances, in, upon, or connected with said premises during said term; and shall also promptly comply with and execute all rules, orders and regulations of the Southeastern Underwriters Association for the prevention of fires, at Tenant's own cost and expense. It is understood that the premises are to be used solely for the purposes set forth on page one and for no other purposes. The Tenant shall not at any time suffer the premises to be used or occupied for any illegal, dangerous, or noxious trade or business, or in any manner which would tend, in the reasonable judgment of Landlord, to impair the character, reputation, or appearance of the Building.

(b)    ADA: The parties acknowledge that the American with Disabilities Act of 1990 (42 U.S.C.

'12101 et seq.) and regulations and guidelines promulgated thereunder, as all of the same may be amended and supplemented from time to time (collectively referred to herein as the "ADA") establish requirements for business operations, accessibility and barrier removal, and that such requirements may or may not apply to the Demised Premises depending on, among other things: (1) whether Lessee's business is deemed a "public accommodation" or "commercial facility", (2) whether such barrier removal requirements are "readily achievable", (3) whether any alterations affect or could affect accessibility, and (4) whether any alterations affect or could affect a "primary function area" and/or trigger "path of travel" requirements. The parties hereby agree that: (a) Lessor shall have no responsibility whatsoever with respect to ADA compliance, (b) Lessee shall be responsible for ADA compliance in the Demised Premises, including any leasehold improvements or other work to be performed in the Demised Premises under or in connection with this LEASE. Lessee shall protect, defend (with counsel selected by Lessor), indemnify and hold Lessor harmless from and against any and all claims, costs (including attorneys' fees and costs incurred through all levels of proceedings, demands, liabilities and obligations arising out of Lessee's obligations hereunder.

It is further understood and agreed that the Tenant is fully responsible for maintaining and allowing the use of an ADA handicapped restroom facility along with clear passage to and from said restroom for the entire shopping center located at 315 President Barack Obama Hwy, Riviera Beach, FL.

## SECTION TEN

### SURRENDER OF PREMISES

Lessee shall surrender the Premises at the end of the Term, or any renewal of such Term, in the same condition as when Lessee took possession, allowing for reasonable use and wear. Before surrender, Lessee shall remove all business signs placed on the Premises by Lessee and restore the portion of the Premises on which they were placed in the same condition as when delivered by Lessor. Lessor shall have the right 60 days prior to the termination of this lease to place "FOR RENT" signs (or their equivalent) in or on the Premises.

It is also fully understood and agreed that the pole sign in front of the store is NOT the property of the Tenant nor does the Tenant have the right to use it. In Landlords sole and absolute discretion within Thirty (30) Day written notice from Landlord Tenant must remove their sign and replace with a blank Lexan sheet fitted to the existing sign box at Tenants sole cost and expense.

## SECTION ELEVEN

### PARTIAL DESTRUCTION OF PREMISES

Partial destruction of the Premises shall not render this Lease void or voidable, nor terminate it except as specifically provided in this Lease. If the Premises are partially destroyed during the Term of this Lease, Lessor shall repair them when such repairs can be made in conformity with governmental laws and regulations, within 180 days of the partial destruction. Written notice of the intention of Lessor to repair shall be given to Lessee within 60 days after any partial destruction. Fixed Rent will be reduced proportionately to the extent to which the repair operations interfere with the business conducted on the Premises by Lessee. If the repairs cannot be made within the time specified above, Lessor shall have the option to make them within a reasonable time and continue this Lease in effect with proportional rent rebate to Lessee as provided for in this Lease. If the repairs cannot be made in 180 days, and if Lessor does not elect to make them within a reasonable time, either party shall have the option to terminate this Lease.

Disputes between Lessor and Lessee relating to provisions of this section shall be arbitrated. The parties shall each select an arbitrator, and the two arbitrators selected shall together select a third arbitrator. The three arbitrators shall determine the dispute, and their decisions shall be binding on the parties. The parties shall divide the costs of arbitration equally between them.

## SECTION TWELVE

### ENTRY ON PREMISES BY LESSOR

Lessor reserves the right to enter on the Premises at reasonable times to inspect them, perform required maintenance and repairs, or to make additions, alterations, or modifications to the Common Areas or to any part of the building in which the Premises are located, and Lessee shall permit Lessor to do so. Lessor may erect scaffolding, fences, and similar structures, post relevant notices, and place moveable equipment in connection with making alterations, additions, or repairs, all without incurring liability to Lessee for disturbance of quiet enjoyment of the Premises, or loss of occupation or use of the Premises. Lessor will have the right (i) to establish, modify and enforce reasonable rules and regulations from time to time with respect to the Common Areas; (ii) to enter into, modify and terminate agreements pertaining to the use and maintenance of the Common Areas; (iii) to close temporarily portions of the Common Areas; and (iv) to do and perform such other acts in and to said areas and improvements as Lessor shall determine.

## SECTION THIRTEEN

### SIGNS, AWNINGS, AND MARQUEES INSTALLED BY LESSEE

Lessee shall not construct or place signs, awnings, marquees, or other structures projecting from the exterior of the Premises without the prior, express, and written consent of Lessor. Lessee shall remove signs, displays, advertisements, or decorations it has placed on the premises that, in the opinion of Lessor, are offensive or otherwise objectionable in Lessor's sole opinion. If Lessee fails to remove such signs, displays, advertisements, or decorations within 5 days after receiving written notice from Lessor to remove them, Lessor reserves the right to enter the Premises and remove them at the expense of Lessee. In any event, Lessee shall conform any signs to the Sign Criteria then in effect for the Shopping Center. A copy of the current Sign Criteria (which may be changed by Lessor in Lessor's sole discretion without notice) is attached as Exhibit A. Lessee shall not conduct "Going out of Business," "Lost Our Lease," "Bankruptcy,"

or other sales of a similar nature on the Premises without the prior written consent of Lessor.

It is also fully understood and agreed that the pole sign in front of the store is NOT the property of the Tenant nor does the Tenant have the right to use it. In Landlords sole and absolute discretion within Thirty (30) Day written notice from Landlord Tenant must remove their sign and replace with a blank Lexan sheet fitted to the existing sign box at Tenants sole cost and expense.

## SECTION FOURTEEN

### LIENS

Notwithstanding anything to the contrary in this Lease, Tenant shall never, under any circumstances, have the power to subject Landlord's interest in the Premises to any liens of any kind nor shall any provision in this Lease be construed as empowering Tenant to encumber or cause Tenant to encumber the title or interest of Landlord in the Premises. In order to comply with the provisions of Section 713.10 Florida Statutes, it is specifically provided that neither Tenant nor anyone claiming by, through or under Tenant, including, without limitation, contractors, subcontractors, materialmen, mechanics and laborers, shall have any right to file or place any kind of lien whatsoever upon the Premises or any improvement thereon, and any such liens are specifically prohibited. All parties with whom Tenant may deal shall be put on notice that Tenant has no power to subject Landlord's interest to any claim or lien of any kind or character, and all such persons so dealing with Tenant must look solely to the credit of Tenant, and not to Landlord's interest or assets. Tenant shall put all such parties with whom Tenant may deal on notice of the terms of this Section. If at any time a lien or encumbrance is filed against the Premises as a result of Tenant's work, materials or obligations, Tenant shall promptly discharge said lien or encumbrance, and if said lien or encumbrance has not been removed within ten (10) days from the date it is filed, Tenant shall deposit with Landlord cash in an amount equal to one hundred fifty percent (150%) of the amount of any such lien or encumbrance, to be held by Landlord (without interest) until any such lien or encumbrance is discharged.

## SECTION FIFTEEN

### NONLIABILITY OF LESSOR/EXCULPATION

Lessor shall not be liable for liability or damage claims for injury to persons or property from any cause relating to the occupancy of the Premises by Lessee, including those arising out of damages or losses occurring on sidewalks and other areas adjacent to the Premises during the Term of this Lease or any extension of such Term. Lessee shall indemnify Lessor, its agents, employees, officers and directors, to the greatest extent permitted by the laws of the State of Florida from any and all liability, loss, or other damage claims or obligations resulting from any injuries or losses of any nature, directly or indirectly related to the Lessee's use and occupancy of the Premises, including, without limitation, any claims arising in common or other areas of the property of the Lessor.

The obligations of Lessor under this Lease do not constitute personal obligations of Lessor or its individual partners, shareholders, directors, officers, employees and agents, and Lessee shall look solely to Lessor's then existing interest in the Premises, and to no other assets, for satisfaction of any liability in respect of

8

this Lease, and will not seek recourse against Lessor's individual partners, shareholders, directors, officers, employees or agents, or any of their personal assets or those of any related entity for such satisfaction. No other properties or assets of Lessor or any related entity shall be subject to levy, execution, or other enforcement procedures for the satisfaction of any judgment (or other judicial process) or for the satisfaction of any other remedy of Lessee arising out of or in connection with this Lease, the relationship of landlord and tenant, or Lessee's use of the Premises. Lessee's sole right and remedy in any action concerning Lessor's reasonableness (if and where the same is required under this Lease) shall be an action for either declaratory judgment or specific performance.

## SECTION SIXTEEN

### LIABILITY INSURANCE

Lessee shall procure and maintain in force at its expense during the Term of this Lease and any extension of such Term, public liability insurance with insurance companies and through brokers approved by Lessor. Such coverage shall be adequate to protect against liability for damage claims through public use of or arising out of accidents occurring in or around the Premises, in a minimum amount of $1,000,000 for each person injured, $1,000,000 for any one accident, and $1,000,000 for property damage. The insurance policies shall provide coverage for contingent liability of Lessor on any claims or losses. Lessor, and any other persons or entities designated by Lessor must be named as an additional insured under any such policy of insurance. The insurance policies shall be delivered to Lessor for safekeeping. Lessee shall obtain a written obligation from the insurers to notify Lessor in writing at least 30 days prior to cancellation or refusal to renew any policy.

If the insurance policies required by this section are not kept in force during the entire Term of this Lease or any extension of such Term, Lessor may, but shall not be required to procure the necessary insurance and pay the premium for it, and the premium shall be repaid to Lessor as an Additional Rent installment for the month following the date on which the premiums were paid by Lessor.

Section 1: Tenant shall not carry any goods or conduct its business in a manner which will in any way tend to increase the insurance rates on the Premises, the building of which they are a part or the Building. Tenant agrees to pay as Rent any increase in Landlord's insurance premiums, resulting from Tenant's activities, whether or not Landlord has consented to such activity If Tenant installs any equipment that overloads any of the Building systems, Tenant shall at its own expense make whatever changes are necessary to these systems to comply with the requirements of the insurance underwriters and governmental authorities having jurisdiction. Tenant shall promptly comply with the recommendations or demands made by the insurance carrier insuring the Building concerning health, safety and welfare matters. If Tenant fails to comply, Landlord may take all steps necessary to comply with the insurance carrier's recommendation or demands and charge Tenant for all costs of compliance plus a service charge of twenty percent (20%), as Rent.

Section 2: Tenant shall keep in effect an liability insurance policy with respect to the Premises and the business operated by Tenant, which policy shall have a deductible no greater than $500.00, be issued by an insurer with a Best's Rating of at least A-VII and in which the limits of liability shall be not less than One Million Dollars ($1,000,000) for one person and Two Million Dollars ($2,000,000) for more than one person in any single incident. The limits of liability shall be increased by at least twenty percent (20%) each five (5) years of the Term and any extensions. Such policy shall expressly contain a

9

contractual endorsement to provide coverage for Tenant's indemnification obligations in this Lease. Tenant shall furnish Landlord with a certificate of insurance or other acceptable evidence that such insurance is in force, and evidence that the premiums have been timely paid by Tenant.

Section 3: Tenant shall keep in effect a policy of insurance upon its fixtures, equipment, stock of goods and upon all of the plate glass in or around the Premises including the front and side of the Premises, against loss by fire and windstorm and for extended coverage in reasonable amounts as may be required by Landlord, which coverage shall in no event be less than the full replacement cost with a deductible not exceeding Fifty Thousand Dollars ($5,000.00). Tenant shall furnish Landlord with a certificate of insurance or other acceptable evidence that such insurance is in force, and evidence that the premiums have been timely paid by Tenant.

Section 4: Tenant shall maintain a comprehensive boiler and machinery equipment policy, including electrical apparatus, if applicable, which policy may have a deductible of not more than Fifty Thousand Dollars ($5,000.00).

Section 5: Tenant shall maintain a workers' compensation insurance policy and Employer's Liability coverage in at least the amount of One Million Dollars ($1,000,000). Notwithstanding the foregoing, Tenant shall not be required to maintain a workers' compensation insurance policy and Employer's Liability coverage, as required pursuant to this Section 5 of Article 13, until the earlier to occur of (i) the day that Tenant opens for business or (ii) the day that Tenant first hires an employee, provided, however, during such time that Tenant elects not to carry such coverages, Tenant shall indemnify Landlord, its mortgagees and agents from and against any liability for claims, actions, costs, and damages for injuries or death to any person, which would have been covered by Tenant's worker's compensation coverage or Employer's liability coverage, and shall defend Landlord against any claims that otherwise would be covered under Tenant's worker's compensation coverage or Employer's liability coverage, but for Tenant's election not to carry such coverage, including Waiver of subrogation. This paragraph shall survive the termination or expiration of the Lease

Section 6: Tenant shall maintain an Excess Liability policy which limit of liability shall not be less than One Million Dollars ($1,000,000.00).

Section 7: Business interruption insurance in an amount sufficient to reimburse Tenant for a minimum of one year's income for direct or indirect loss of earnings attributable to perils commonly insured against by prudent tenants or attributable to prevention of access to the Premises as a result of such perils shall be maintained by Tenant.

Section 9: All insurance required of Tenant in this Lease, shall be primary and non-contributory with respect to Landlord's liability arising out of the act or omission of Tenant, its officers, agents, employees or invitees, and shall include (i) include Landlord, Landlord's investment advisor,(Your Entity Name) and Landlord's Managing Agent, (Management entity), insureds additional insureds (except Site Pollution Legal Liability; (ii) a clause or endorsement denying the insurer any right of subrogation against Landlord and Managing Agent; and (iii) a provision requiring the insurer to give Landlord thirty (30) days' notice prior to cancellation. Tenant waives any rights of recovery against Landlord and Managing Agent for injury or loss due to hazards covered by insurance.

TH

In the event Tenant fails to purchase and maintain the insurance required herein, Landlord may purchase such insurance on behalf of Tenant and charge Tenant the premium for such insurance, together with a service charge of twenty percent (20%), as Rent.

Section 10: Tenant hereby releases and waives on behalf of itself and on behalf of its insurers, any and all claims and any rights of subrogation of any such insurer against Landlord, (Your entity's name) and Managing Agent and their respective employees and agents for loss (other than loss or damage resulting from the willful act of such other party, its employees and agents) sustained from any peril to person or property required to be insured against herein, whether or not such insurance is actually in force, or from any peril to persons or property actually insured against, though not required to be under this Lease. The policies of Tenant shall contain an express waiver of subrogation to this effect.

## SECTION SEVENTEEN

### ASSIGNMENT, SUBLEASE, OR LICENSE

Lessee shall not assign or sublease the Premises (or any part thereof), nor grant any right or privilege connected with the Premises or use thereof, nor allow any other person except agents and employees of Lessee to occupy the Premises (or any part thereof) without first obtaining the prior written consent of Lessor, which consent may be granted or withheld by Lessor in its sole and absolute discretion. Consent by Lessor to one assignment, sublease or license shall not be consent to any subsequent assignment, sublease, or license. An unauthorized assignment, sublease, or license to occupy by Lessee shall be void and at the option of Lessor shall terminate this Lease.

The interest of Lessee in this Lease is not assignable by operation of law without the written consent of Lessor. Any assignment for the benefit of creditors, or any transfer of stock, partnership, or other form of ownership interest in Lessee is prohibited except in accordance with the provisions of this Section. In addition, no assignment, sublease or license, whether with or without Lessor's consent shall affect any personal or corporate guaranty.

As a condition of considering any request for Lessor's approval, Lessee shall pay Lessor's reasonable attorney fees and or administrative fees in reviewing the terms and considerations of any proposed assignment, sublease or license, whether or not such transfer is approved by Lessor.

## SECTION EIGHTEEN

### BREACH

Failure to pay any item of Rent when due, the appointment of a receiver to take possession of the assets of Lessee, a general assignment for the benefit of the creditors of Lessee, any action taken or allowed to be taken by Lessee under any bankruptcy act, or the failure of Lessee to comply with any term and/or condition of this Lease shall constitute a breach of this Lease. Lessee shall have 5 days after receipt of written notice from Lessor of any breach to correct the conditions specified in the notice. If Lessee cannot reasonably cure such breach within the 5 day period, Lessee shall have a reasonable time to correct the default, provided such action is commenced by Lessee within 5 days after receipt of the notice and diligently pursued to completion. Such additional time shall not be required for any event involving a failure to pay

any item of Rent when due.

## SECTION NINETEEN

## REMEDIES OF LESSOR FOR BREACH BY LESSEE

Lessor shall have the following remedies in addition to its other rights and remedies in the event Lessee breaches this Lease and fails to make corrections as set forth in Section Eighteen:

A. Lessor may reenter the Premises immediately and remove the property and personnel of Lessee, store the property in a public warehouse or at a place selected by Lessor, at the expense of Lessee.

B. After reentry, Lessor may terminate this Lease on giving 10 days written notice of termination to Lessee. Without such notice, reentry will not terminate this Lease. On termination, Lessor may recover from Lessee all damages proximately resulting from the breach, including, but not limited to, the cost of recovering the Premises and the balance of the Rent payments remaining due and unpaid under this Lease.

C. After reentering, Lessor may relet the Premises or any part of the Premises for any term without terminating this Lease, at such rent and on such terms as it may choose. Lessor may make alterations and repairs to the Premises. The duties and liabilities of the parties if the Premises are relet shall be as follows:

(1) In addition to Lessee's liability to Lessor for breach of this Lease, Lessee shall be liable for all expenses of the reletting, for the alterations and repairs made, and for the difference between the rent received by Lessor under the new Lease and the Rent installments that were due for the same period under this Lease.

(2) Lessor, at its option, shall have the right to apply the rent received from reletting the premises (a) to reduce Lessee's indebtedness to Lessor under this Lease, not including indebtedness for Rent, (b) to expenses of the reletting and alterations and repairs made, (c) to Rent due under this Lease, or (d) to payment of future Rent under this Lease as it becomes due.

If the new Lessee does not pay a Rent installment promptly to Lessor, and the Rent installment has been credited in advance of payment to the indebtedness of Lessee other than Rent, or if rentals from the new Lessee have been otherwise applied by Lessor as provided for in this section, and during any Rent installment period, are less than the Rent payable for the corresponding installment period under this Lease, Lessee shall pay Lessor the deficiency, separately for each rent installment deficiency period, and before the end of that period. Lessor may, at any time after such reletting, terminate this Lease for the breach on which Lessor based the reentry and relet the Premises.

After reentry, Lessor may procure the appointment of a receiver to take possession and collect rents and profits of the business of Lessee. If necessary to collect the rents and profits, the receiver may carry on the business of Lessee and take possession of the personal property used in the business of Lessee, including inventory, trade fixtures, and furnishings and use them in the business without compensating Lessee. Proceedings for appointment of a receiver by Lessor, or the appointment of a receiver and the conduct of the business of Lessee by the receiver, shall not terminate this Lease unless Lessor has given written notice of termination to Lessee as provided in this Lease.

TH

## SECTION TWENTY

## ATTORNEY FEES

If Lessor engages the services of an attorney or law firm to enforce any agreement contained in this Lease, or for breach of any covenant or condition, by filing an action or otherwise, Lessee shall pay Lessor reasonable attorney fees for the services of Lessor's attorney in the action.

## SECTION TWENTY-ONE

## CONDEMNATION

Eminent domain proceedings resulting in the condemnation (or a deed in lieu thereof) of a part of the Premises, but leaving the remaining premises usable by Lessee for the purposes of its business, will not terminate this Lease unless Lessor, at its option, terminates this Lease by giving written notice of termination to Lessee. The effect of any condemnation, where the option to terminate is not exercised, will be to terminate this Lease as to the portion of the Premises condemned, and the lease of the remainder of the Premises shall remain intact. The Fixed Rent for the remainder of the lease term shall be reduced by the amount that the usefulness of the Premises has been reduced for the business purposes of Lessor. Lessee assigns and transfers to Lessor any claim it may have to compensation for damages as a result of any condemnation. Lessee shall have no claim upon any award or damages awarded to Lessor by virtue of any condemnation or deed in lieu thereof.

## SECTION TWENTY-THREE

## WAIVERS

Waiver by Lessor of any breach of any covenant or duty of Lessee under this lease is not a waiver of a breach of any other covenant or duty of Lessee, or of any subsequent breach of the same covenant or duty.

## SECTION TWENTY-FOUR

## GOVERNING LAW

It is agreed that this Lease shall be governed by, construed, and enforced in accordance with the laws of the State of Florida

## SECTION TWENTY-FIVE

## ENTIRE AGREEMENT

This Lease shall constitute the entire agreement between the parties. Any prior understanding or representation or any oral agreement of any kind preceding the date of this Lease shall not be binding upon either party except to the extent incorporated in this Lease or by separate written instrument executed by both parties or their authorized representatives.

TH

## SECTION TWENTY-SIX

## MODIFICATION OF AGREEMENT

Any modification of this Lease or additional obligation assumed by either party in connection with this agreement shall be binding only if evidenced in a writing signed by each party or an authorized representative of each party.

## SECTION TWENTY-SEVEN

## NOTICES

All notices, demands, or other writings that this Lease requires to be given, or which may be given, by either party to the other, shall be deemed to have been fully given when made in writing and deposited in the United States mail, registered and postage prepaid, and addressed as follows:

To Lessor: H. Alan Welles Real Estate, LLC



To Lessees: Jangela Hill

The address to which any notice, demand, or other writing may be given or made or sent to any party as above provided may be changed by written notice given by such party as above provided.

## SECTION TWENTY-EIGHT

## BINDING EFFECT

This Lease shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the parties.

## SECTION TWENTY-NINE

## TIME OF THE ESSENCE

It is specifically declared and agreed that time is of the essence of this Lease and each and every provision hereof.

14

TH

## SECTION THIRTY

### OPTIONS

Lessee shall have One (1) option to renew Lease at then market rent with the same terms and conditions for a period of Five (5) years each provided Lessee has not been in default of the Lease more than twice (2) during the initial term of the Lease. Lessee must also provide notice to Lessor in writing of intention to renew Lease no less than One Hundred Eighty (180) days prior to Lease expiration.

## SECTION THIRTY-ONE

### PARAGRAPH HEADINGS

The titles to the paragraphs of this Lease are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this Lease.

Signature Page Attached

TH  e

IN WITNESS WHEREOF, the respective parties have signed, sealed and delivered this Lease on the date and year written below.

WITNESS

WITNESS: _____
TRina Johnson

WITNESS: _____
Shakeyria McCoy

(SEAL)

LESSOR:
ANV Management, LLC,
a Florida limited liability company

By: _____
H. Alan Welles, Mgr

Dated 8/29/17

WITNESS: _____
TRina Johnson

WITNESS: _____
Shakeyria McCoy

Dated 8/29/17

LESSEE:

Tonala Shieree Hill

By: _____
(SEAL)

■

WITNESS: _____
TRina Johnson

WITNESS: _____
Shakeyria McCoy

Dated 8/29/17

GUARANTOR:

Tangela Hill

By: _____
(SEAL)

## EXHIBIT A

Space to be delivered in As-Is.

Landlord to install new window AC unit in Ste. 104 at Tenants request anytime during Lease provided Tenant is not in default at time of request.

TH

EXHIBIT B



## The City of Riviera Beach

**600 W. Blue Heron Blvd.**
**Riviera Beach, FL 33404**
**Telephone: (561)845-4060**

Certificate of Use ☑

Business Tax Receipt ☑

### Certificate of Use/Business Tax Receipt Application

**Warning:** this application is not a Certificate of Use or Business Tax Receipt

PCN# (REQUIRED) 5 6 - 43 - 42 - 33 - 09 - 000 - 0850

BUSINESS NAME: JD'S BEAUTY SUPPLIES LLC

BUSINESS ADDRESS: 315 President Barack Obama Bl SUITE #: 105 CITY: Riviera Bch ST: FL ZIP: 33404

BUSINESS PHONE: 561 444-2636  E-MAIL ADDRESS: Jdsbeautysupplies@gmail.com

MAILING ADDRESS: 315 President Barack Obama Blvd SUITE #: 105 CITY: Riviera Bch ST: Fl ZIP: 33404

DESCRIBE NATURE OF BUSINESS IN DETAIL: Retail Beauty Supplies and Hair
Salon

MANAGER/APPLICANT'S NAME: Tangela S. Hill                          (If a corporation attach a list of all officers)

OWNER: Tangela S. Hill                          TITLE: Owner

DATE OF BIRTH: 04/01/1987   DRIVER'S LICENSE# ███████████ ST: FLORIT

### PLEASE INCLUDE ANY APPLICABLE INFORMATION BELOW

STATE LICENSE OR FLORIDA BAR CARD #: ███████ /

SQ. FT._____ INVENTORY AMOUNT $_____ # OF EMPLOYEES_____ # OF SEATS_____

# OF MACHINES_____ # OF VEHICLES_____ # OF AMUSEMENT DEVICES/POOL TABLES_____

ARE YOU APPLYING FOR A MOBILE VENDOR LICENSE? YES OR NO (PLEASE CIRCLE ONE)

HAVE YOU BEEN ISSUED A NOTICE OF VIOLATIONS? YES OR NO (PLEASE CIRCLE ONE)

IS THIS A RENTAL PROPERTY? YES OR NO (PLEASE CIRCLE ONE) IF YES, PLEASE COMPLETE AFFIDAVIT FOR RENTAL UNIT

HAS THIS BUSINESS BEEN TAXED WITHIN THE CITY BEFORE? YES OR NO (PLEASE CIRCLE ONE)

WHERE?_____ WHEN?_____

IS THE PROPOSED BUSINESS LOCATION VACANT? YES OR NO (PLEASE CIRCLE ONE) IF YES, HOW LONG HAS THE LOCATION

BEEN VACANT_____ IF NO, WHAT IS THE CURRENT USE?_____

IS BUSINESS A HOME OCCUPATION? YES OR NO (PLEASE CIRCLE ONE) IF YES, PLEASE COMPLETE HOME OCCUPATION AFFIDAVIT

1. THE PLACE OF BUSINESS MUST BE OPEN TO ALL INSPECTORS.
2. IT IS THE APPLICANT'S RESPONSIBILITY TO FOLLOW UP ON THIS PROCESS.
3. DO NOT OPERATE A BUSINESS WITHOUT A CERTIFICATE OF USE AND BUSINESS TAX RECEIPT.

## **IMPORTANT INFORMATION**

YOUR **FIRST STEP** IN OBTAINING A CERTIFICATE OF USE IS TO RECEIVE **ZONING VERIFICATION** TO DETERMINE THAT THE LOCATION IS PROPERLY ZONED FOR THE PROPOSED BUSINESS ACTIVITY. AFTER RECEIVING ZONING VERIFICATION YOU MUST OBTAIN CODE ENFORCEMENT AND FIRE INSPECTIONS AND APPROVAL FROM THE POLICE DEPARTMENT.

I certify that all the above information is true and correct, and I understand that any false statements constitute a violation of Florida State Statutes § 831.01 and will result in the revocation or denial of Certificate of Use and prosecution in accordance with the law. I hereby agree to operate the above-described business in accordance with all the laws of the State of Florida and the laws and ordinances of the City of Riviera Beach. Furthermore, I understand that the issuance of this Certificate of Use is conditioned upon the compliance with all ordinances and the results of any investigations of the above described business.)

APPLICANT'S SIGNATURE: Tangela Hill                          DATE: 9/18/17

PRINTED NAME: Tangela Hill

- **SIGNATURES MUST BE ORIGINAL**
- **APPLICATION MAY NOT BE FAXED**